## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| $34,600.00 IN UNITED STATES | ) | |
| CURRENCY; 1998 FREIGHTLINER, VIN | ) | |
| 1FUPCSZB1WL942130; and 2001 UTILITY | ) | 8:06CV567 |
| TRAILER, VIN 1UYVS25371C473412, | ) | |
| | ) | MEMORANDUM AND ORDER |
| Defendants, | ) | |
| | ) | |
| ENDER GUANIPA and | ) | |
| | ) | |
| HUMBERTO RUANO, | ) | |
| | ) | |
| Claimants. | ) | |

This is an action pursuant to 18 U.S.C. § 881 for the forfeiture of the defendant properties, which were seized as the result of a traffic stop conducted by the Nebraska State Patrol on March 12, 2006, on Interstate 80 in Seward County, Nebraska. Claimant, Humberto Ruano, alleges that he is the owner of the defendant truck tractor and trailer and also claims part of the defendant currency. Claimant, Ender Guanipa, was the passenger in the vehicle at the time of the traffic stop. Guanipa claims part of the defendant currency. Both Claimants contend that a total of $38,000 was seized on March 12, 2006, rather than $34,600.

Pursuant to 28 U.S.C. § 636 and the consent of the parties, the matter was tried to the court on May 23 and May 30, 2007. The briefing schedule expired on July 20, 2007, at which time the case was deemed submitted for decision.

As discussed below, the court finds that judgment should be entered in favor of the United States on all claims.

## I. JURISDICTION

This court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1345, 1355 and 1395, and pursuant to 18 U.S.C. § 881.   Venue in this district is proper under 28 U.S.C. § 1391.

## II. TESTIMONY

David Lewis Frye testified that he has been employed by the Nebraska State Patrol since July 1997 and has been a traffic trooper since December 1999.  To become a state trooper, Frye completed a 22-week course put on by the State Patrol.  He subsequently received training relating to interdiction, i.e., apprehending criminals on the roadway.  Criminal interdiction training teaches officers about things to look for–indicators or items of interest–to help an officer use the totality of information learned during a traffic stop or an encounter to determine whether there could be criminal activity other than a traffic violation, and what to do if the officer suspects criminal activity.

Frye also completed the Drug Interdiction Assistance Program ("DIAP"), a federal program sponsored by the El Paso Intelligence Center, the Drug Enforcement Administration (DEA), and the U.S. Department of Transportation.  DIAP provides training on interdiction, current trends, concealments, and other information that would help officers and departments identify when somebody might be involved in criminal activity on the roadways.

Frye has attended the Desert Snow school, which he described as a much more advanced school privately owned by recently retired California highway patrolmen.  Desert

Snow offers a passenger vehicle school and a commercial vehicle school, both of which include hands-on training.  Frye has attended both schools and, in September 2001, began instructing for Desert Snow.

Within the past year, Frye has done some instruction for the DIAP and received federal certification to instruct on criminal interdiction.

Frye testified that he has been the primary officer in over 30 currency seizures totaling over $4 million in cash.  He has assisted other officers  in more than 20 other seizures of cash.  He has, on occasion, chosen not to pursue the forfeiture of the currency and returned it to the owners.

During his training, and based on experience, Frye has received instruction on distinguishing "legitimate" cash from cash that is connected to illegal activity, and particularly  in relation to the denominations of cash involved.  When a person has a large amount of cash, one factor to consider is where the cash is concealed.  Is it concealed in a place where a normal person would keep currency, or in a constructed compartment or in a natural void of a vehicle?  Another factor the State Patrol considers to help determine whether the currency is "legitimate" is whether a person tells the officer about it, whether it exists.  For example, prior to searching any vehicle, the state troopers always ask if there are specific items in the vehicle, and currency is one of the items named.  If the driver says there was not, and then the officer finds there was cash hidden somewhere in the vehicle, that fact would be used as a determination.  Regarding denominations, when an officer encounters legitimate people who have large amounts of cash, the cash will be in large denominations.  For example, if a person withdraws $20,000 from a bank, the bank will not issue it in fives, tens and twenties; the bank will pull out hundreds.  A bank will not want to

give out the smaller bills unless they are specifically requested.  Frye has learned through training and experience that the denomination most commonly circulated with regard to drug contraband is the $20 bill.

As to packaging, Frye testified that legitimate currency is generally found in a briefcase, luggage, or in a bank bag.  Illegitimate currency is generally placed in cellophane packaging, sometimes with something to mask or cover the odor of drugs that might be on the currency.  Smugglers will often vacuum-seal money to prevent such an odor from being detected, for example, by a dog.

Frye testified that he works in uniform, driving a marked patrol car.  For the most part, his work involves enforcing traffic laws on the interstate and highways in Nebraska.  A state trooper's duties may also involve responding to domestic disturbances; assisting motorists on the roadway, and picking up debris in the roadway.  There are certain regions that are patrolled more than others, such as "East 80," which is Interstate 80 from Lincoln to the Platte River.

While working East 80, Frye comes into contact with commercial vehicles and truckers on a daily basis.  He talks to the truckers about their logs and the daily logs that drivers have to keep.  Frye described the daily logs as regulations for the driver.  Drivers are required to keep track of the hours they spend driving, loading vehicles,  off duty, not driving, and the time they spend in their sleeper.  The regulations were enacted to promote public safety in operating commercial vehicles, and the log book serves as an enforcement mechanism.

Frye's training as an interdiction officer has also made him aware of "source cities" and "destination cities."  For the most part, illegal drugs originate from the southwest

United States, although Canada has become a significant source of marijuana. The direction of travel is significant; westbound travel generally involves large amounts of currency being transported versus drugs, while eastbound travel usually involves the transport of drugs.

On March 12, 2006, Frye was in uniform patrolling East 80 in a marked cruiser. He was proceeding west to assist other officers with an accident scene when he encountered the claimants' vehicle. Frye testified he was traveling westbound in the left/passing lane at 85-90 miles per hour, running with "wig-wags," which is a configuration of white lights flashing up on the top mounts and headlights flashing back and forth. At approximately mile marker 389, near the border between Lancaster County and Seward County, the claimants almost caused Frye to hit them when they suddenly merged into the passing lane. Frye had to hit the brakes to avoid running right into them. Apparently, they were trying to pass a minivan. Frye decided to make a traffic stop for the unsafe lane change. The stop occurred at about 9:15 a.m. near the 388 marker in Seward County. The weather was cold, with some sleet and light snow.

The driver, Humberto Ruano, pulled over. Frye parked his cruiser behind Ruano's truck, exited the cruiser, walked down the passenger side of the truck and around the front and waited for the driver to exit. Ruano then exited the vehicle. Frye advised Ruano why he was stopped and requested that Ruano retrieve his driver's license, his log book, and all the paperwork regarding his truck and trailer, including insurance papers. As truck drivers are also required to have certain permits regarding fuel and insurance, Frye also asked for those permits. Frye explained that he was still a commercial vehicle inspector and it is his responsibility to insure that truck drivers are not driving 24 straight hours; that

is why it is important that the officer get all the documentation.  Requesting such documentation from a truck driver is no different than asking for a registration from a passenger vehicle.

Ruano produced the papers, and they went back to the patrol car.  Frye looked at the log book and saw that the truck was moving while Ruano was sleeping, which indicated that there must have been a co-driver.  Frye had a discussion with Ruano and sent him back to the truck to get his co-driver's log book and license.  Ruano returned to the cruiser with the log book and driver's license of the co-driver, Ender Guanipa.

Frye conversed with Ruano while he reviewed their paperwork.  He determined that Ruano and Guanipa had all the appropriate papers and completed a warning for the traffic violation.

Based on the paperwork, Frye determined that the truck belonged to Ruano.  He was unable to determine who owned the trailer, as it was registered in the name of MRG, a company unrelated to Ruano or Ruano's employer, A-1 Trucking.  According to Frye, trucks and trailers are normally registered to the same entity or to related entities.  For example, "[Y]ou don't stop a Swift truck pulling a Swift trailer that's registered to Werner Enterprises."  Frye did not understand why the trailer was not registered in Ruano's name, as the truck was registered to Ruano.  Ruano did not drive for MRG and he did not have any other documentation regarding MRG.  Ruano told Frye that the trailer belonged to him.

Frye also talked to Ruano about the load he was transporting.  Ruano presented a shipping paper indicating that it was Hershey's syrup that was being shipped from Pennsylvania to California.

Frye asked Ruano how they were getting paid. According to Frye, "leased" drivers are typically paid in one of two ways: by the mile, or by a percentage of the load that they have on board. Ruano told Frye that they were getting paid a set sum of $3,000. Ruano and Guanipa were working for another company who set up their loads for them. The $3,000 figure was not a percentage, and they were not getting paid by the mile.

Frye noted from the paperwork that Ruano had an excessive amount of down time for a truck driver in his home base area. The average driver has about five weeks off during the course of a given year. The log books showed that Ruano and Guanipa had taken off three weeks between taking a load from Florida to Pennsylvania and transporting the load from Pennsylvania to California. Frye acknowledged that the three weeks could have been planned vacation time; however, Ruano told Frye that his truck and trailer were paid for, so he could drive whenever he wanted to and did not need to drive as much as a normal truck driver does. This statement was not consistent with Frye's experience that truck drivers generally struggled to make a living. If driving a truck is a person's legitimate means to make money, it is not normal to encounter people who just dabble in it part-time. He had never encountered anybody else who told him they had their truck paid off and they could "just kind of work whenever they want to."

Frye also discussed with Ruano the point that the truck and trailer were involved in a marijuana drug bust with several hundred pounds in Mississippi two or three years ago. Ruano told Frye that he was the owner of the truck when it was involved in the bust, but neither he nor Guanipa were present when the vehicle was busted. Ruano stated that he had a driver who was driving for him and that driver was now dead. Frye asked Ruano why

they didn't seize his truck and trailer, at which time Ruano indicated that there was a lien on the truck at the time. Frye learned that the lien was subsequently paid off.

Frye also talked to Ruano about how Guanipa was going to be paid with regards to the $3,000. Ruano said they were going to split the money after they paid for their expenses from the trip. This information was significant to Frye because, in a legitimate truck-driving industry, the owner of the truck would receive a larger share of the profits due to the owner's maintenance costs and investment in the truck.

Ruano's paperwork also indicated that the company was newly formed. Frye testified that he learned from Ruano that the company involved in some past drug seizures had changed its name. Everything in the company was the same–people, drivers, ownership–except they changed the name of the company from "Transport Depot" to "A-1 Transport," which was the name currently placed on Ruano's truck. In Frye's experience, trucking companies that have been "busted" for illegitimate business will change their name from one company to another to sidestep reports that go out to law enforcement advising officers to watch for trucking companies that have been involved with drug seizures. This particular group had been hit a couple different times, one just a few months prior to the March 12, 2006 traffic stop. Immediately after they were caught with that load of drugs, they changed their company name.

Frye explained that Ruano and Guanipa were co-drivers for this particular semi, which was leased to A-1 Transport. In this type of arrangement, the drivers sign an agreement providing that the company will find loads for them to haul, and the company keeps part of the fee. It is time consuming, inconvenient, and costly for all concerned if the company frequently changes its name and paperwork. Ruano indicated that the company

-8-

had to change its name for insurance reasons, but the explanation made no sense to Frye, who believed it could be considered insurance fraud if the company just changed names to avoid an insurance issue.

After he finished speaking with Ruano, Trooper Frye went back to the truck tractor, to verify the vehicle identification number (VIN). While he was at the truck, Frye spoke briefly with the passenger, Ender Guanipa about the trip and specifically the load. They talked about the arrangement between Guanipa and Ruano about how much they were getting paid for the load to transport and how they would divide the money between them. Guanipa told Frye that they were being paid $3,700 to transport the load and Ruano had advised that they would be splitting the profits. They also talked briefly about the company having changed names and Guanipa said that the company prior had been Transport Depot and was now A-1 Transport.

Frye returned to the patrol car to finish paperwork with the driver, Ruano. After Ruano began to exit the patrol vehicle, Frye if he could speak further with him, and Ruano agreed. At that time Frye asked Ruano specifically if they had any marijuana, cocaine, methamphetamine, explosives, or large amounts of currency in the truck. Ruano denied having any of these items in the vehicle. At that point, Frye asked Ruano, "Can I search your truck and trailer?" Ruano responded affirmatively, giving Frye permission to conduct the search.

Frye then told Ruano that he needed to speak with Guanipa to make sure he didn't have any issues with the search. He had been trained to ask for permission from all occupants to avoid legal issues. Frye sought consent from Guanipa, who also indicated that Frye could search the vehicle.

-9-

At some point during the traffic stop, Frye called for backup.  Trooper Stake responded to the call.  Frye requested, for his own safety, that Ruano and Guanipa stand about 50 feet in front of the semi and off to the shoulder so that they would be in a safe location while the truck was searched.  Frye asked Trooper Stake to watch the occupants. Ruano and Guanipa did as Frye requested.

Frye did not find anything of significance in the trailer.  The condition of the tractor, however, was of interest.  Usually, trucks like this are designed to be used as a kind of motor home for drivers on cross-country trips, and the drivers will carry food, clothing, and other necessary items.  In this instance, the cupboards where clothes and food are normally placed were, for the most part, bare.  He did find a duffle bag of clothing up on the main bed and a couple of bags under the bed.  It appeared that the bottom bunk was being used, but the top bunk was not–its mattress was still wrapped in plastic.  Frye admitted on cross-examination, however, that the mattress wrapped in plastic also had a pillow and blanket on it.  He did not see any food inside the vehicle.  He did notice a lot of "extras" in the tractor, e.g., expensive chrome accessories and "numerous things that were purchased after the fact, basically money invested into the truck to make the truck shinier on the inside."  *See* Exhibits 7 & 8.

Frye also noticed a white gap under a black plastic panel to the right of the accelerator.  Frye was familiar with the design of this particular truck.  The paneling was meant to cover electric circuit boards and wiring for the dash.  Nothing white was supposed to be there.  The screws were removed from the top of the panel.  After the panel was lowered, Frye could physically observe two packages crammed in with the wiring.  See Exhibit 9.  The currency depicted in Exhibit 6, consisting of a bundle partially wrapped in

paper toweling, a vacuum-sealed package of rubber-banded bundles, and a rubber-banded bundle of loose cash, was removed from behind this panel.

Frye admitted on cross-examination that he did not notice any "masking odors" when he searched the truck.

After the currency was discovered, for safety reasons, Ruano and Guanipa were handcuffed and placed in the patrol car, where their conversation was recorded. One sat in the front passenger seat, and the other in the back passenger seat.

Frye continued to search the truck at the scene and made arrangements for the vehicle to be moved. The items found in the truck included a tied-up Wal-Mart bag containing "all new clothes" which still had tags and were not laundered for wearing. Due to the difficulty in maneuvering such a vehicle in a commercial parking lot, Frye believed it would be unusual for a truck driver to take a semi, pull into a Wal-Mart parking lot and go shopping for a complete set of clothing before starting a trip.

The vehicle was eventually taken to Lincoln, as were Ruano and Guanipa.

Trooper Frye interviewed Humberto Ruano at the NSP's Lincoln traffic office. Frye testified that Ruano was "detained," as opposed to being under arrest. In any event, he was not free to leave. Ruano was not handcuffed with his hands together; however, he was handcuffed to a 70-pound bucket of cement.

Frye read Ruano his *Miranda* rights before asking questions, and Ruano agreed to be interviewed. The interview was tape recorded. Frye first obtained information about Ruano's place of residence, employment, and the like. He asked Ruano about the currency that was found in the vehicle, explaining that he believed it was drug contraband. Frye also asked whether Ruano knew anything about the money; if he did not, Frye had

-11-

a waiver form that he could sign.  Ruano responded that the money belonged to him and Guanipa and did not sign the waiver form.

Frye asked Ruano why they had that much money.  Ruano responded that he and Guanipa were going to purchase a truck – a blue 2001 Freightliner – from a dealership in Ontario, California.  The deal was made about a month prior, when they were in California. Originally, the dealership wanted $43,000 for that truck, but he made a deal with the salesperson to buy it for $38,000.  Ruano told Frye he did not know the name of the dealership or the salesperson.  He was hoping the truck would still be there and would recognize the salesman when he saw him.

Frye also asked Ruano about the packaging of the money and how much of the money was his.  Ruano explained that he had $20,000 inside the truck wrapped in plastic, i.e., the vacuum-sealed package.  He said he vacuum-sealed the money to keep out the humidity.  The currency in the vacuum-sealed package was rubber-banded in bundles, a point of significance to Trooper Frye.

Ruano remained under detention, but was ultimately released.

Trooper Frye subsequently conducted an interview with Ender Guanipa, who was also handcuffed to the bucket of cement for security reasons.  Guanipa agreed to speak with Frye after being given *Miranda* warnings.  At first Guanipa said $20,000 of the currency belonged to him.  He quickly changed his answer and said that $18,000 was his. Frye noted that any conversation between Ruano and Guanipa while they were in the patrol car had been recorded.  He believed the two of them hashed out a plan about what

they would tell Frye about the money.  It appeared that Guanipa was just trying to get his facts straight based on a story they had rehearsed.[1]

Frye asked Guanipa which packages specifically were his.  He replied that about two weeks prior to the stop, he had given Ruano a $12,000 bundle of currency wrapped in a paper towel or napkin and clear taped shut.  He subsequently gave another $6,000 bundle to Ruano.  This bundle was rubber-banded but not wrapped.

Guanipa told Frye the money was taken from paychecks over a period of time and he stored the money in his room at home.

Both Ruano and Guanipa told Frye they had bank accounts but neither of them gave any explanation as to why this money was not held in a bank account, or why they could not just write a check when they reached the dealership in California.  Guanipa said he had about $2,000 in his bank account, and Ruano reported having about $2,700 in his.

Guanipa told Frye that he and Ruano were going to buy a truck in California.  According to Guanipa, they did not know what kind of truck they were going to buy, and had not actually found one or made arrangements to buy one; they were going to try and find one when they got to California.  Guanipa claimed a portion of the seized currency and did not sign a waiver saying the money was not his.

Exhibit 13 is a Registration Receipt, a document that motor carriers are required to carry.  The document allows the various states to prorate or calculate the vehicle's taxes and insurance.  This particular registration receipt indicates that A-1 Transport Logistics

---

[1]The recorded conversation was transcribed on May 18, 2006.  The transcript, Exhibit 2, tends to support Frye's perception that Ruano and Guanipa had "rehearsed" the information they gave about the money.

Incorporated ("A-1 Transport") was authorized to operate three trucks in certain specified states; however, only one of the trucks appeared to be able to travel almost anywhere. The document reflected the actual size of the company, which helped Frye evaluate the drivers' responses about how they got paid, and the like.  Exhibit 14 shows that a new Department of Transportation registration number was assigned to A-1 Transport on October 21, 2005.  Exhibit 16 is the trailer registration showing the owner as M R G Transport, which conflicted with Ruano's statement that the trailer belonged to him.  Exhibit 15 is a copy of the registration for the truck, which was registered to Humberto Ruano.

After the currency was seized, Frye placed the money in special bank bags, which were closed with a special tool.  Evidence tags were placed on the bags, and the tags were then crimped in place.  The money was transported to the bank depository, where it remained until the officers could get to the bank.  In this instance, the money was placed into the bank bags in the same condition as it was found: one vacuum-sealed package, one loose bundle, and one bundle half wrapped in white paper toweling.  *See* Exhibit 6. Frye assisted Sergeant Hagemeyer in taking the money to Wells Fargo Bank, where Hagemeyer put the bags into the night depository.

Frye ultimately issued a traffic ticket or a warning ticket to Ruano for the unsafe lane change; however, no criminal charges were ever filed against either Ruano or Guanipa. No controlled substances or weapons were found in either the truck tractor or the trailer, and Frye did not discover any information that either Ruano or Guanipa had any criminal history pertaining to the use of illegal drugs.

Nebraska State Patrol Investigator Jeremy Dugger testified he held the rank of trooper in March 2006, at which time he was stationed as a canine handler within the

carrier enforcement division. He conducted most of his activities along Interstate 80 between Omaha and Lincoln, and had a canine with him. His dog was a Belgian Malinois named Duke. Duke was trained in narcotics detection and handler protection; he was a "single purpose" dog and was certified to detect four kinds of narcotics, specifically, marijuana, heroin, methamphetamine and cocaine. Dugger and Duke were certified as a canine detection team in March 2004 and were recertified in 2005 and 2006.

On March 12, 2006, Dugger was called to assist Trooper Frye at the traffic stop on Interstate 80. Dugger did not use Duke to conduct a sniff of the truck; however, he did conduct a "discretionary sniff" of the currency at the NSP headquarters traffic office in Lincoln. Dugger explained that a canine handler will sometimes perform a discretionary sniff to investigate suspected drug currency. In summary, the suspect currency is placed into a search area and hidden in a place unknown to the canine handler. An amount of "control currency," i.e., currency that had not been exposed to the odor of narcotics, is hidden in a separate location unknown to the handler. The canine handler then conducts a sniff of the search area with the dog to see if the odor of drugs is present in the room. In this instance, Duke indicated to the place in the room where the suspected drug-related currency was hidden. The dog did not alert or indicate to the control currency.

Sergeant Bethleen Hagemeyer testified that she had been employed by the Nebraska State Patrol ("NSP") for over 27 years. On Sunday, March 12, 2006, Hagemeyer was serving as a duty sergeant and was temporarily assigned as evidence officer. She was contacted by the dispatcher, who told her to come in to work because Trooper Frye had made a cash seizure.

Generally, an officer who seizes money packages and seals the currency and gives it to the evidence officer who, in turn, deposits the money at the night depository bank at Wells Fargo in Lincoln.  In this instance, the currency was already packaged and sealed in Wells Fargo bank bags when Hagemeyer took possession.  Each bag was marked with an evidence tag identifying the case number, the officer number, the defendant's name and generally describing the contents of the bag, i.e., that it contained money.  Hagemeyer signed for the bags and had Trooper Frye escort her to the night depository bank, as she was off-duty at the time.  The evidence officer has access to a key to the night depository drop.  Hagemeyer testified that she and Frye took separate cars to Wells Fargo Bank; however, Hagemeyer had to return to headquarters and get the key.  She retrieved the key "expeditiously," met Frye at Wells Fargo Bank, opened the night depository and deposited the bags of money in the vault.  Hagemeyer was not present when the money was counted.

On March 12, 2006, Angela Bell was employed by the Nebraska State Patrol as an evidence technician for "Headquarters Troop" covering the Lincoln area.  She was the "chain of custody" person, responsible for maintaining the integrity and security of evidence brought into custody.  When evidence was brought into her custody, Bell verified the contents with a computerized database.  The evidence was then stored in the proper location.  Bell followed the evidence all the way through until disposition.

Bell was not contacted on March 12, 2006 regarding Trooper Frye's seizure of cash. She became aware of the seizure on Monday, March 13, 2006, at which time she contacted Sergeant Lonnie Connelly to accompany her to the bank.  She contacted Wells Fargo Bank and arranged a time to count the money.  This was a routine procedure.

Bell and Connelly went to the bank around 10:00 a.m., specifically, to the drive-up teller area of the downtown bank, to the night deposit safe located in the back room. Shawn Daily and another Wells Fargo employee were present in the room. The two bank employees removed the money from the night deposit safe. The officers inspected the seals to make sure they were intact, then opened the bags and removed the money. Bell testified that the bags were about the size of a gallon-size storage bag, and there were two or three bags to open in this case. Bell testified that she inspected the locks on the bags, and they were intact. The locking mechanism resembled a zip tie with a crimp lock on the side that required a special tool to crimp it shut. Bell could not recall who crimped the bags shut, but testified they would have been crimped shut before being placed in the night deposit box. She and Connelly removed the money from the bags and counted it on a tabletop money counter.

Bell recalled that one bundle of money was wrapped in a paper towel and Saran Wrap and there were three bundles of money in a VacuSeal bag. The VacuSeal bag was still vacuum-sealed when they opened it. She, Connelly, Shawn Daily, and the other Wells Fargo employee were present when the bags were opened. The two bank employees ran the money through the money counter and recorded the amounts on a bank receipt, broken down into denominations, as they counted the money. Exhibits 3 and 4, the receipts that were filled out at the time the money was counted, indicate that the bags contained a total of $34,600. Exhibit 6 depicts the bundles of currency taken from the bags. After the money was counted, it was bundled together and a cashier's check was issued for the amount of the total, i.e., $36,000. *See* Exhibit 5. Bell testified that she followed a bank employee out of the room to the main lobby of Wells Fargo where the

cashier's check was cut.  The cashier's check was put into an evidence bag and submitted into evidence.

Shawn Daily testified that on March 12, 2006, he was employed as lead teller at the downtown branch of Wells Fargo Bank in Lincoln and had held that position for over five years.  In that capacity, he was fairly routinely involved with cash being counted and converted to cashier's checks for the Nebraska State Patrol. He was contacted by the State Patrol on Monday, March 13, 2006, about a cash seizure made the day before and recalled Angela Bell and another officer coming to the bank for that purpose.  It was the bank's practice to wait for the State Patrol before removing the money from the night deposit vault.  The bank also required dual-control access to the vault.

According to Daily, he and Danny Zaiger (another Wells Fargo teller) met with Bell and the other officer in the bank lobby in the early afternoon.   They then went to the back room of the bank's detached drive-through, where the night deposit vault was located. Daily and Zaiger opened the vault and Zaiger removed the bags.  The night drop was in the same room where they counted money, so they placed the bags on the table and started counting, using a money counter.  The bank's normal practice was to have one team member run the money through the counter, which would detect counterfeit bills and "foreign" bills (like a $10 bill in the 20s).  The second team member would verify that number, would strap the currency up if there was a whole strap[2], verify that information, and then record it on a piece of paper.  Although the State Patrol officers were present, it was not the bank's practice to let an officer run the money through the money counter.  If

---

[2]For example, one hundred $20 bills would require a 2,000 strap.

the machine jammed, or if the machine indicated there was a double-feed, they would count the money a second time. Daily testified there were no problems of that nature when they counted the money on March 13, 2006.

After the first team member ran the money through the machine, the second member would strap the money and set it aside. The money never left the area. Typically, if there were four bundles, they would only count one bundle at a time. Once all the 20s were run through, they would record the information on the sheet and would have the other team member verify that the right amount was recorded.

Daily explained that Exhibits 3 and 4 are the Cash Buy/Sell sheets typically used in cash exchanges between tellers. The bank consistently used these forms with the State Patrol to record the breakdown of the denominations of currency for them. Daily testified he recorded the breakdown of denominations on Exhibit 3 and Zaiger recorded the breakdown of denominations on Exhibit 4.

Once all the money was counted, Daily and Zaiger added up the separate sheets using an adding machine. They added it up twice, just to verify that they added correctly. At that point, the bank would issue a cashier's check to the State Patrol. Zaiger and Daily physically removed the cash from the room for that purpose. The State Patrol officers stayed in the room.

According to Daily, it took four or five minutes to procure the cashier's check. Due to the amount of money involved, the transaction required an approval and the bank had to file a currency transaction report. Daily identified Exhibit 5 as the purchaser's copy of the cashier's check issued in this instance.

-19-

Humberto Ruano testified that he came to the United States from Cuba in 1992. He is now 38 years old and is a legal resident of the United States. He has a 9th grade education and has been driving a truck for 14 years. He has known Ender Guanipa for three years. Ruano denied ever selling or transporting illegal drugs. On March 12, 2006, Ruano was employed as a truck driver through a contract with A-1 Transport. Ruano's federal income tax returns (Schedule C) show that he had gross receipts of $122,330 and total expenses of $108,927 in 2006 (Exhibit 110); receipts of $75,371 and expenses of $64,219 in 2003 (Exhibit 104); receipts of $142,850 and expenses of 113,441 in 2004 (Exhibit 105); and receipts of $57,300 and expenses of $36,346 in 2005 (Exhibit 106).

The truck in question was owned by Ruano and is registered to Ruano. He testified that he bought the truck in 1999 and paid for it on credit. It was paid off in 2004.

Ruano recalled being pulled over by the Nebraska State Patrol on March 12, 2006. He was traveling to Oakdale, California with Ender Guanipa. He travels through Ontario, California, about two or three times a month. He initially testified that he had $20,000 in the vehicle and the other money belonged to his partner. Ruano did not characterize the money as being "hidden." He testified he could not carry it in his briefcase when he left the truck so, for his own protection, he kept it "safe" by hiding it in the vehicle. According to Ruano, he and Ender Guanipa were going to use the money to buy a truck in California. He had looked at the truck in Ontario, California about a month prior. He did not put his money in the bank because

> when I sold my restaurant I declared that money but I kept some cash in my hand because I wanted to make an investment to buy a truck, so – and I kept that part of the money and I wanted to buy a truck so I kept saving money little by little so I could put all the money together in order to buy a truck that was a little better quality, a little better truck.

-20-

184:8-14.  Ruano stated that he wrapped money in plastic because he"had kept it for quite some time and [he] was afraid it would get humid" (184:16-17), and so he could not easily spend the money (229:13-17).  Apparently, his family in Cuba kept their money hidden at home, wrapped in plastic so it would not get wet, because they could not trust the banks in Cuba.  Ruano got the idea of vacuum-packing his money because he had worked in a restaurant, where he vacuum-sealed various food items.

Ruano stated on cross-examination that the vacuum-sealed package contained $18,500.  When asked why this package contained over $11,500 in $20 bills and a much lesser amount in $100 bills, Ruano stated that was how he got it when he sold the restaurant.  It was a cash sale.  He received the proceeds of the sale in mostly $20 bills and did not think that was unusual.  He stated that he had a checking account, but only kept enough money in the account to pay bills.  He attributed his prior statement to Trooper Frye that he owned $20,000, rather than $18,500, to nervousness, pressure, and his inability to understand English.  He did admit that whenever he had been stopped by a law enforcement officer in the United States, he had always spoken to the officer in English. On redirect, Ruano stated that a total of $20,000 belonged to him, although only $18,500 of it had been vacuum-sealed in plastic.

According to Ruano, approximately $16,000 of the money in the vacuum-sealed package came from the sale of the restaurant.  He initially kept the $16,000 at his home, in the attic, wrapped in newspaper.  When he had accumulated a total of $18,500, he packed everything and vacuum-sealed it about seven months prior to the traffic stop.  He kept the vacuum-sealed package in the attic.

-21-

Ruano testified on cross-examination that he became worried during the traffic stop that the officers would take him to jail because he was carrying the money but had told them he was not.  He was 23 years old when he left Cuba.  In his experience, police and banks were to be avoided in Cuba.  He did not tell Trooper Frye that he was afraid he might be taken to jail.

Ruano testified he purchased the Sagua Café in 2001 for $16,000, operated the business, and then sold it in 2003 "more or less" (211:9) because the business required excessive work, interfered with his family life, and was losing money.  Ruano testified that his part of the money that was seized by Trooper Frye came from the sale of the Sagua Café[3] and from income that he saved.  He stated that he did not use any of the proceeds from the sale of the Sagua Café to pay off his truck.  He testified that he sold the business for $35,000 but does not have any records of the transaction because he divorced his wife and left everything with her.[4]  When asked on cross-examination where the $19,000 profit was  reported on his income tax return for 2003, Ruano eventually indicated he did not understand the question.  On redirect examination, Ruano recalled that his accountant prepared a separate tax return in 2003 for the sale of the restaurant, and the accountant was aware that Ruano had sold the business for a profit.

Immediately prior to buying the restaurant, Ruano worked for Jantogal, a trucking company.  Ruano owned a truck during 2001, but did not personally drive it.  He was paid

---

[3]Exhibit 107 contains statements from Union Planters Bank addressed to Sagua Café Inc. The bank statements cover the time period from June 30, 2002 through December 31, 2002.

[4]Exhibit 8 includes a Schedule K-1 for Sagua Café, Inc., a 2002 Form W-2 showing Ruano's wages from the Sagua Café, and a 2001 Combined Tax Notice of ad valorem taxes owed by Sagua Café, Inc.  Ruano testified he obtained these three pages of documents from the government.

for use of the truck by Jantogal.  After selling the Sagua Café, Ruano once again drove for the trucking company, which had changed its name to Transport Depot and is now known as A-1 Trucking.   When he was stopped by Trooper Frye, he was hauling empty barrels and was going to be paid $3,700 for the job.

Ruano also testified that he was the owner of the defendant trailer.  When reminded that the trailer was actually registered to "owner" MRG Transport, Ruano explained that MRG was the owner of the trailer, but they gave it to Ruano so Ruano would continue paying for it; MRG did not want to continue paying for the trailer.  Ruano simply neglected to transfer the title over to his name and had finished paying for the trailer in 2004.

Turning to Exhibit 11, portions of the log book, Ruano stated that he was required to fill out those documents and was taught how to fill out the forms, in English, by a federal worker when he began working on the road.  He testified that he could not read English, but he signed the lease with A-1 Transport (Exhibit 19) after somebody from the company read it to him in Spanish.

Ender Guanipa testified that he came to the United States in 1987 from Venezuela and has been a truck driver for five years.  He is now 37 years old.  He has been driving with Ruano for over three years and travels to California two or three times per month with Ruano.  Guanipa's tax returns (Exhibits 103 & 109) indicated that his gross receipts from trucking amounted to $54,675 in 2005 and $71,965 in 2006.  His total expenses amounted to $54,092 in 2005 and $74,159 in 2006.  Guanipa denied ever selling or transporting illegal drugs and denied that the money found in the truck was derived from the sale or transportation of drugs.  He stated that the "chrome" fixtures identified by Trooper Frye were actually made of plastic and there was very little actual chrome in the truck.

-23-

Guanipa testified that on March 12, 2006, he and Ruano were traveling to Oakdale, California.  Ruano was driving.  They had $38,000 in the truck, $18,000 of which belonged to Guanipa.  According to Guanipa, the money came from their savings and was hidden in the vehicle so that it would not be lost or stolen.

Guanipa reported a net profit of $583 in 2005 for his business as a long haul trucker.  *See* Exhibit 103, Schedule C.  For tax year 2006, he reported a net loss of $2,194.  *See* Exhibit 109.  He admitted that he is required to make monthly child support payments of over $732 per month and pays $900 per month in rent.  Guanipa stated on cross-examination that it took him two or three years to save $18,000 and he never stopped to think about why it was mostly in $20 bills.  His practice was to cash his paychecks at the bank, pay his bills, and keep the rest.  He typically stored the money loose in a drawer in his bedroom and was not worried that it would get damp.  Guanipa testified he did not trust the bank, but kept a bank account so he could pay creditors who do not accept cash payments.

Guanipa testified that he wrapped $12,000 of his money in a Bounty paper towel with masking tape and gave Ruano another $6,000 two or three weeks before the traffic stop.  He and Ruano intended to purchase a truck in California so they could start a small corporation and hire someone else to drive the truck, which would allow them to spend more time in Miami with their families.  He had not actually seen the truck that he and Ruano were going to purchase, although Ruano had seen the truck in mid-February 2006 and told Guanipa about it then.

According to Guanipa, A-1 Transport had about 30 active trucks in March 2006. He disagreed with Trooper Frye's testimony that A-1 was authorized to operate only three

trucks.  A-1 Transportation paid Guanipa and Ruano based on the trip.  A-1 takes 18%, and the drivers get the rest.  Guanipa stated he was not nervous when the state trooper pulled them over; however, he did become nervous after being handcuffed.  He was not handcuffed at the time he gave the trooper permission to search the vehicle.

### III.  LAW

In the Verified Complaint for Forfeiture (Filing 1), the government alleges that "the defendant properties were used or were intended to be used to commit or facilitate the commission of violations of Title 21, United States Code, Sections 841 and 844" and are, therefore, subject to forfeiture pursuant to 21 U.S.C. § 881(a)(6).  Section 881(a)(6) authorizes the forfeiture to the United States of "[a]ll moneys, negotiable instruments, securities, or other things of value furnished or intended to be furnished by any person in exchange for a controlled substance or listed chemical in violation of this subchapter, all proceeds traceable to such an exchange, and all moneys, negotiable instruments, and securities used or intended to be used to facilitate any violation of this subchapter."

The Civil Asset Forfeiture Reform Act of 2000, 18 U.S.C. § 983 (CAFRA), governs the burden of proof in this matter:

> (c) In a suit or action brought under any civil forfeiture statute for the civil forfeiture of any property–
> (1) the burden of proof is on the Government to establish, by a preponderance of the evidence, that the property is subject to forfeiture;
> (2) The Government may use evidence gathered after the filing of a complaint for forfeiture to establish, by a preponderance of the evidence, that property is subject to forfeiture; and
> (3) if the Government's theory of forfeiture is that the property was used to commit or facilitate the commission of a criminal offense, or was involved in the commission of a criminal offense, the Government shall establish that there was a substantial connection between the property and the offense.

-25-

The term "facilitate" encompasses activity making the prohibited conduct less difficult or more or less free from obstruction or hindrance.  *United States v. Real Property Located at 3234 Washington Ave. North, Minneapolis, Minn.*, 480 F.3d 841, 843 (8th Cir.  2007) (quoting *United States v. Premises Known as 3639-2nd St., N.E., Mpls., Minn.*, 869 F.2d 1093, 1096 (8th Cir. 1989) (internal quotations omitted).

In this case, the government must establish by a preponderance of the evidence that the defendant currency and vehicles were substantially connected to drug trafficking, as is required for civil forfeiture under 21 U.S.C. § 881(a)(6).  *See United States v. $117,920 in United States Currency*, 413 F.3d 826, 829 (8th Cir. 2005)

The government may use circumstantial evidence to establish its burden of proof. *See United States v. $84,615 in United States Currency*, 379 F.3d 496, 501 (8th Cir. 2004) (citing *United States v. $10,700 in United States Currency*, 258 F.3d 215, 224 n.6 (3d Cir. 2001)); *see also United States v. $117,920*, 413 F.3d at 829.  "In a forfeiture trial the government does not have to show evidence of, or trace the money to, a particular narcotics transaction."  *United States v. $150,660 in United States Currency*, 980 F.2d 1200, 1205 (8th Cir. 1992); *see also United States v. $10,700 in United States Currency*, 258 F.3d 215, 225 (3d Cir. 2001). The Eighth Circuit has often recognized that possession of a large amount of cash is strong evidence that the cash is connected with drug activity. *See, e.g., United States v. $84,615*, 379 F.3d at 501-502; *United States v. $117,920*, 413 F.3d at 829; *United States v. $124,700 in United States Currency*, 458 F.3d 822  (8th Cir. 2006).

If the government meets its burden, the claimants have the burden of proving by a preponderance of the evidence that (a) they have an ownership interest in all or a portion of the seized property, *United States v. One Lincoln Navigator 1998*, 328 F.3d 1011, 1013 (8th Cir. 2003), and (b) they are "innocent owners" as defined under 18 U.S.C. § 983(d).[5]

### A.  Government's Burden of Proof

### 1.  The Currency

The defendant currency was seized in circumstances similar to those presented in *United States v. $124,700 in United States Currency*, 458 F.3d 822 (8th Cir. 2006):

- a large amount of rubber-banded currency was found concealed in the claimants' vehicle,

- the claimants initially lied to the officers about the presence of cash in the vehicle, and then told the officers the money was just being kept safe, and

- a drug dog alerted to the odor of narcotics on the currency.

There, the Court of Appeals observed that possession of a large sum of cash is strong evidence of a connection to drug activity,  458 F.3d at 826, and observed:

> while an innocent traveler might theoretically carry more than $100,000 in cash across country and seek to conceal funds from would-be thieves on the highway, we have adopted the common-sense view that bundling and concealment of large amounts of currency, combined with other suspicious circumstances, supports a connection between money and drug trafficking.

*Id.*  In *United States v. $117,920*, the court held that evidence of concealment supported a connection between the money and drug trafficking:

---

[5]18 U.S.C. 983(d)(1) provides, "An innocent owner's interest in property shall not be forfeited under any civil forfeiture statute.  The claimant shall have the burden of proving that the claimant is an innocent owner by a preponderance of the evidence."

> The money in [the claimant's] trunk was bundled in rubber bands, enclosed within a plastic sack, and hidden beneath clothing in a duffle bag. [The Claimant] lied to the investigating officer about not having a large amount of currency, and he had materials with him that the officer knew were used to package drugs and conceal them from detection. The drug dog's alert to [the] currency and the bags smelling of marijuana in his car also support a connection between the money and drug trafficking. *See $84,615 in United States Currency*, 379 F.3d at 502; *$141,770.00 in United States Currency*, 157 F.3d at 604; *U.S. Currency in the Amount of $150,660.00*, 980 F.2d 1200, 1206 (8th Cir. 1992).

413 F.3d at 829.

The recorded conversation between claimants Ruano and Guanipa while they were waiting in the patrol car demonstrates that the claimants devised a story to legitimize the money that was found in the vehicle – they agreed to tell the officers that they put the money together between the two of them to buy a truck, and Ruano would tell the officers he got his share of the money from working and from selling a restaurant. The truck in which the currency was found had previously been associated with drug trafficking. Finally, the claimants' tax records suggest that they are persons of modest means, yet they had already taken three weeks of unpaid "down time" or vacation by the time they were stopped by Trooper Frye on March 12, 2006.

The totality of the circumstances "leads most naturally to the inference" that both of the claimants were "involved in illegal drug activity, and that the currency was substantially connected to it." *See United States v. $124,700*, 458 F.3d at 826. The government has met its burden of proof in this regard.

### 2. The 1998 Freightliner, VIN 1FUPCSZB1WL942130

The 1998 Freightliner vehicle was registered to claimant, Humberto Ruano. This vehicle was previously involved in a drug bust yielding several hundred pounds of

marijuana but was not seized at that time because there was a lien on the truck.  The lien has since been released.

Exhibit 2 (pp. 9 & 11, second part) shows that the claimants told Trooper Frye at the time of the traffic stop that Ruano purchased the truck on credit for $15,000 and paid for it in installments of $1,500 per month.  The truck was paid off in 2004.

Ruano's tax returns for 2003 and 2004 (Exhibits 104 & 105) do not contain any entries for depreciation or interest payments for any truck, trailer, or other vehicle.  Ruano testified that he did not use any proceeds from the sale of the Sagua Café  to pay for the truck.  His tax records strongly suggest that he did not earn enough money from working as a truck driver to make monthly payments of $1,500 during the relevant time period.  These factors support the inference that the truck was purchased with funds generated by means other than the trucking industry.  The vehicle's history, the amount and condition of currency found concealed in the vehicle, and Ruano's history of association with a trucking company that changed its name three times within the past five years after drug-related mishaps all tend to show that this vehicle was substantially connected to drug trafficking.

Considering the totality of credible evidence presented, the court finds that the government has met its burden of proof as to the defendant 1998 Freightliner vehicle.

### 3.  The 2001 Utility Trailer, VIN 1UYVS25371C473412

Although Mr. Ruano claims ownership of the defendant trailer, the record shows that the 2001 trailer was, in fact, registered to MRG Transport.  Ruano's testimony that MRG gave him the trailer if he would make the payments on it is not credible.  Ruano did not testify as to the amount of payments he supposedly assumed on behalf of MRG Transport.

-29-

Even assuming that his $1,500 monthly payments for the truck included the payments for the trailer, it does not appear that Ruano's income earned from trucking was sufficient to cover these payments and he has not identified any other source of legitimate income. The purchase of such a trailer by a sole proprietorship[6] is a significant expense–an expense that is not reflected in Ruano's tax returns.  Nor did Ruano transfer the title over to his name, although he purportedly finished paying for the trailer in 2004.

Considering these circumstances, together with the factors discussed above, the court finds that the government has met its burden of proving, by a preponderance of the evidence, that the defendant trailer was substantially connected to drug trafficking.

## B.  Innocent Ownership Defense

Since the United States has met its burden in establishing a substantial connection between defendant currency and vehicles and drug trafficking, the burden shifts to the claimants to refute the government's case by proving that they are "innocent owners" of the property.  *See United States v. 392 Lexington Parkway S.*, 386 F. Supp. 2d 1062, 1066-67 (D. Minn. 2005).  The term "innocent owner" means an owner who did not know of the conduct giving rise to forfeiture, or, upon learning of the conduct giving rise to the forfeiture, did all that reasonably could be expected under the circumstances to terminate such use of the property.  § 983(d)(2)(A)(i) & (ii). The term "owner" does not include "a person with only a general unsecured interest in, or claim against, the property or estate of another[.]"  § 983(d)(6)(B)(i).

---

[6]For tax purposes, Ruano and Guanipa reported their income and expenses as sole proprietors in the trucking business.

-30-

### 1.  The Currency

The claimants have attempted to persuade the court that the currency found hidden in the truck was derived from savings and from Ruano's cash sale of his restaurant in 2003.  In most material respects, the claimants' testimony defies common sense.

The court simply does not believe Ruano's testimony that a buyer appeared with $35,000 in cash–most of it in $20 bills–to purchase Ruano's business.  While it does appear that Ruano once owned a business called the Sagua Café, Ruano did not offer any evidence documenting the sale of the business.  While he may have, in fact, abandoned his business records when he left his wife, it would seem reasonable to believe that these records would have been available from Ruano's accountant, who Ruano says prepared a separate tax return on Ruano's behalf reporting the profit for the sale of the restaurant.

Nor does the court believe that either claimant's professed fear or distrust of the banking industry prompted them to hoard thousands and thousands of dollars in their dresser drawers and/or attic.  Both men have lived and done business in the United States for a considerable period of time, and both men maintain bank accounts.  Considering Guanipa's reported income, or lack thereof, the court does not believe that he was able to save $18,000 (mostly in $20 bills) from his earnings as a truck driver over two or three years.  As to Ruano, this court has never before been offered the explanation that over $17,000 in currency was vacuum-packed in plastic and hidden in an attic or vehicle for seven months to preserve it from humidity and/or to prevent the owner from spending it.

Finally, the claimants contest the amount of money that was actually seized.  The information they gave to Trooper Frye and their testimony in this court was, charitably speaking, "unclear" as to the amounts of cash they claimed were hidden in the truck and

as to how the money should be divided between them.  The government has presented credible evidence that $34,600 was seized from the vehicle on March 12, 2006, and the court finds that the $34,600 figure is correct.

For all these reasons, the court finds that the claimants have demonstrated an ownership interest, but have failed to prove by a preponderance of the evidence that they are "innocent owners" of the defendant currency.

### 2.  The 1998 Freightliner, VIN 1FUPCSZB1WL942130

Turning to the claim of Humberto Ruano for the 1998 Freightliner vehicle, the court finds that Ruano has shown by a preponderance of the evidence that he has an ownership interest in the vehicle.  As discussed above, the court finds that Ruano's testimony on many material issues was not credible.

The court finds that Ruano has not proven by a preponderance of the evidence that he "did not know of the conduct giving rise to forfeiture, or, upon learning of the conduct giving rise to the forfeiture, did all that reasonably could be expected under the circumstances to terminate such use of the property."  18 U.S.C. § 983(d)(2)(A)(i) & (ii).

### 3.  The 2001 Utility Trailer, VIN 1UYVS25371C473412

For purposes of the "innocent owner" defense, the term "owner" does not include "a person with only a general unsecured interest in, or claim against, the property or estate of another[.]"  § 983(d)(6)(B)(i).  In this instance, the trailer is not registered to Ruano.  As discussed above, the court does not find credible Ruano's testimony that he owns the trailer due to his assuming the payments for the trailer on behalf of its registered owner. This "purchase" was undocumented.  Ruano purportedly paid for the trailer in 2004, yet failed to register it in his own name.  He did not report the associated expenses or list the

-32-

trailer as a business asset on his income tax returns.  If Ruano has any interest in this item of property, it is only a "general unsecured interest."  Hence, Ruano is not an "owner" of the trailer under § 983(d)(6)(B)(i).

The court finds that claimant Ruano has not proven by a preponderance of the evidence that he has an ownership interest in the trailer.  In the alternative, the court finds that Ruano has not proven by a preponderance of the evidence that he "did not know of the conduct giving rise to forfeiture, or, upon learning of the conduct giving rise to the forfeiture, did all that reasonably could be expected under the circumstances to terminate such use of the property."  18 U.S.C. § 983(d)(2)(A)(i) & (ii).

## IV.  DECISION

The United States has proven by a preponderance of the evidence that all of the defendant property is substantially connected to drug trafficking.  The claimants have not met their burden of proving by a preponderance of the evidence that they are innocent owners of the property.  Thus, the court finds that all the defendant property should be forfeited to the United States and judgment should be entered in favor of the United States and against the claimants.

A separate judgment will be entered pursuant to this Memorandum and Order.

**DATED November 1, 2007.**

**BY THE COURT:**

**s/ F.A. Gossett**
**United States Magistrate Judge**